UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BOSTON DIVISION

| | |
|---|---|
| CALVIN DI NICOLO, Derivatively on Behalf of THE PRINCETON REVIEW, INC., )<br>)<br>Plaintiff,<br><br>v.<br><br>MICHAEL J. PERIK, CHRISTIAN G. KASPER, STEPHEN C. RICHARDS, SUSAN T. RAO, DAVID LOWENSTEIN, LINDA WHITLOCK, RICHARD KATZMAN, MICHAEL A. KRUPKA, JEFFREY R. CRISAN, JOHN S. SCHNABEL, DAVID L. WARNOCK, and ROBERT E. EVANSON,<br><br>Defendants,<br><br>-and-<br><br>THE PRINCETON REVIEW, INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No. |

```
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
```

<u>DEMAND FOR JURY TRIAL</u>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY
DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant The Princeton Review, Inc. ("Princeton Review" or the "Company") against certain of its officers and directors for breaches of fiduciary duties, waste of corporate assets and unjust enrichment.  These wrongs resulted in tens of millions of dollars in damages to Princeton Review's reputation, goodwill, and standing in the business community.  Moreover, these actions exposed the Company to potential liability in a federal securities class action based on defendants' improper statements.

2.      In 2007, Princeton Review hired defendant Michael J. Perik ("Perik") as Chief Executive Officer ("CEO") in order to turn around the struggling company. Perik began implementing his "turn-around plan" in two phases: Phase 1 consisted of cost-cutting, and Phase 2 consisted of growing the business.  Unbeknownst to investors, however, Princeton Review was experiencing significant competitive challenges in the marketplace that frustrated its growth efforts, and therefore, the Company's resurgence efforts faltered.

3.      Perik, and indeed, the Board of Directors (the "Board"), however, had already staked their professional reputations on the success of the turn-around plan.  In order to mask their failure, the defendants made improper statements concerning Princeton Review's revenues, earnings and business operations.  Specifically, defendants issued a series of improper statements designed to: (i) deceive the investing public, including shareholders of Princeton Review, regarding the Individual Defendants' (as defined herein) management of Princeton Review's operations; and (ii) conceal and enhance the Individual Defendants' executive and directorial positions at Princeton Review and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.

4.      When the true nature of the Company's business and operations were disclosed to the public in a series of announcements on March 9 and 10, 2011, Princeton Review's market capitalization declined significantly.  Specifically, on March 10, 2011, the Company's stock value

dropped nearly 38%, resulting in a market capitalization loss of nearly $17 million. The very next day, the Company's stock value dropped an additional 24%, resulting in an additional market capitalization loss of over $6 million. The stock continued to drop steadily thereafter, and as of October 11, 2011, defendants' unlawful course of conduct has cost the Company over $36 million in market capitalization losses.

5.       Additionally, as a direct result of defendants' unlawful course of conduct, Princeton Review is now the subject of a federal securities class action lawsuit filed in the United States District Court for the District of Massachusetts on behalf of investors who purchased Princeton Review's shares.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.       This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

8.       Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Princeton Review maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Princeton Review occurred in this District; and (iv) defendants have received substantial

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

9.      Plaintiff Calvin Di Nicolo was a shareholder of Princeton Review at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Princeton Review shareholder.  Plaintiff is a citizen of Florida.

**Nominal Defendant**

10.      Nominal defendant Princeton Review is a Delaware corporation with principal executive offices located at 111 Speen Street, Suite 550, Framingham, Massachusetts.  Princeton Review is a leading provider of in-person, online, and print education products and services targeting the high school and post-secondary markets. Princeton Review provides assistance in college readiness, test preparation, and career planning services through its three principal divisions: Higher Education Readiness, Penn Foster, and Career Education Partnerships.  Princeton Review is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

11.      Defendant Perik was Princeton Review's CEO, President, and a director from July 2007 to March 2011.  Perik is named as a defendant in a securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act")  and sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Perik knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.  Princeton Review paid Perik the following compensation as an executive:

| Year | Salary | All Other Compensation | Total |
|------|--------|------------------------|-------|
| 2010 | $450,000 | $17,400 | $467,400 |

Perik is a citizen of Rhode Island.

12.     Defendant Christian G. Kasper ("Kasper") is Princeton Review's Executive Vice President and Chief Financial Officer ("CFO") and has been since August 2010.   Kasper was also Princeton Review's Treasurer from August 2010 to at least May 2011.   Kasper is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.   Kasper knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.   Princeton Review paid Kasper the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Total |
|------|--------|-------|---------------|-------|
| 2010 | $144,231 | $250,000 | $1,062,830 | $1,457,061 |

Kasper is a citizen of Massachusetts.

13.     Defendant Stephen C. Richards ("Richards") was Princeton Review's Executive Vice President, Chief Operating Officer ("COO"), and CFO from November 2007 to June 2010.   Richards also served as a consultant to Princeton Review from June 2007 to November 2007.   In connection with his resignation, Richards entered into a one-year consulting agreement with Princeton Review, pursuant to which the Company would pay $420,000 for his consulting services.   Richards is named as a defendant in a securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act and sections 10(b) and 20(a) of the Exchange Act.   Richards knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.   Princeton Review paid Richards the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2010 | $244,644 | - | $210,000 | $454,644 |
| 2009 | $334,615 | $945,000 | - | $1,279,615 |

Richards is a citizen of Massachusetts.

14.     Defendant Susan T. Rao ("Rao") was Princeton Review's Executive Vice President, Finance from September 2007 to December 2009; Treasurer from December 2008 to December 2009; and Principal Accounting Officer from at least March 2009 to December 2009.   Rao was also

CFO of Princeton Review's Test Preparation Services Division from January 2008 to December 2008. Rao is named as a defendant in a securities class action complaint that alleges she violated sections 11, 12(a)(2), and 15 of the Securities Act and sections 10(b) and 20(a) of the Exchange Act. Rao knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency. Rao is a citizen of Massachusetts.

15. Defendant David Lowenstein ("Lowenstein") is Princeton Review's Chairman of the Board and has been since September 2008 and a director and has been since May 2007. Lowenstein is also Chairman of Princeton Review's Audit Committee and has been since at least October 2011 and a member of that committee and has been since at least April 2008. As a member of the Company's Audit Committee, Lowenstein had a duty to establish and maintain a system of internal controls to promote the adequacy and efficiency of the Company's operations, reliability of financial reporting, and compliance with applicable laws and regulations. Lowenstein is named as a defendant in a securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act. Lowenstein knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency. Princeton Review paid Lowenstein the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $40,000 | $11,600 | $51,600 |
| 2009 | $37,875 | $27,050 | $64,925 |

Lowenstein is a citizen of Canada.

16. Defendant Linda Whitlock ("Whitlock") is a Princeton Review director and has been since April 2009. Whitlock is also a member of Princeton Review's Audit Committee and has been since at least April 2009. As a member of the Company's Audit Committee, Whitlock had a duty to establish and maintain a system of internal controls to promote the adequacy and efficiency of the Company's operations, reliability of financial reporting, and compliance with applicable laws and regulations. Whitlock is named as a defendant in a securities class action complaint that alleges she

violated sections 11, 12(a)(2), and 15 of the Securities Act.  Whitlock knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.  Princeton Review paid Whitlock the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $20,000 | $11,600 | $31,600 |
| 2009 | $10,000 | $27,050 | $37,050 |

Whitlock is a citizen of Massachusetts.

17.    Defendant Richard Katzman ("Katzman") is a Princeton Review director and has been since 1985.  Katzman is named as a defendant in a securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Katzman knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.   While in possession of material, non-public information concerning Princeton Review's true business health, Katzmann sold 10,188 shares of his stock for $37,660.80 in proceeds.  Princeton Review paid Katzmann the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $15,000 | $11,600 | $26,600 |
| 2009 | $15,000 | $27,050 | $42,050 |

Katzmann is a citizen of New York.

18.    Defendant Michael A. Krupka ("Krupka") is a Princeton Review director and has been since July 2007.  Krupka is named as a defendant in a securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Krupka knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.  Krupka is a citizen of Massachusetts.

19.    Defendant Jeffrey R. Crisan ("Crisan") is a Princeton Review director and has been since July 2007.  Crisan is named as a defendant in a securities class action complaint that alleges he

violated sections 11, 12(a)(2), and 15 of the Securities Act.  Crisan knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.  Crisan is a citizen of Massachusetts.

20.     Defendant John S. Schnabel ("Schnabel") is a Princeton Review director and has been since December 2009.  Schnabel knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency. Schnabel is a citizen of New York.

21.     Defendant David L. Warnock ("Warnock") is a Princeton Review director and has been since March 2010.  Warnock knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency. Warnock is a citizen of Maryland.

22.     Defendant Robert E. Evanson ("Evanson") was a Princeton Review director from June 2005 to June 2011.  Evanson was also Chairman of Princeton Review's Audit Committee from at least April 2008 to June 2011.  As a member of the Company's Audit Committee, Evanson had a duty to establish and maintain a system of internal controls to promote the adequacy and efficiency of the Company's operations, reliability of financial reporting, and compliance with applicable laws and regulations.  Evanson is named as a defendant in a securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Evanson knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.  Princeton Review paid Evanson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $35,000 | $11,600 | $46,600 |
| 2009 | $33,125 | $27,050 | $60,175 |

Evanson is a citizen of New Jersey.

23.     The defendants identified in ¶¶11-14 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶11, 15-22 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15, 16, 22 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶11-22 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

24.     By reason of their positions as officers, directors, and/or fiduciaries of Princeton Review and because of their ability to control the business and corporate affairs of Princeton Review, the Individual Defendants owed and owe Princeton Review and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Princeton Review in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Princeton Review and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each officer and director of the Company owes to Princeton Review and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

26.     In addition to these duties, under the Company's Charter in effect since 2009, defendants Evanson, Lowenstein, and Whitlock, as members of the Audit Committee owed specific duties to Princeton Review to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements.  In particular, these defendants were charged with oversight of the Company's accounting and financial reporting processes and systems, including "the

quality and integrity of the Company's accounting and reporting practices" and the "Company's compliance with legal and regulatory requirements."  Among other things, the Audit Committee's Charter provides:

> The Audit Committee shall review and discuss with management and the independent auditor (i) the adequacy and effectiveness of the Company's controls (including any significant deficiencies in the design or operation of the Company's internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls), (ii) management's annual assessment of the effectiveness of the internal controls and the independent auditor's attestation and report about management's assessment as required by the SEC, and (iii) the adequacy and effectiveness of the Company's disclosures controls and procedures, and management reports thereon.

> \* \* \*

> The Audit Committee shall discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-[Generally Accepted Accounting Principles ("GAAP")] financial information, as well as financial information and earnings guidance provided to analysts and rating agencies.

**Control, Access, and Authority**

27.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Princeton Review, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

28.     Because of their advisory, executive, managerial, and directorial positions with Princeton Review, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Princeton Review.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding Princeton Review's business turn-around plan.

29.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Princeton Review, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

30.     To discharge their duties, the officers and directors of Princeton Review were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Princeton Review were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Princeton Review conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

31.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Princeton Review, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Princeton Review's Board.

32.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) its operation efficiency.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws.  As a result, Princeton Review has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

34.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Princeton Review, regarding the Individual Defendants' management of Princeton Review's operations; and (ii) conceal their enhancement of the Individual Defendants' executive and directorial positions at Princeton Review and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

35.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

36.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

37.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**IMPROPER STATEMENTS**

39.    The Individual Defendants' improper statements began on March 12, 2009.  On that day, Princeton Review issued a press release announcing its financial results for the fourth quarter and full year 2008, the period ending December 31, 2008.  For the full year, the Company reported that income from continuing operations before taxes was $1.3 million, up from a loss of $31.4 million for the full year ended December 31, 2007, and that full year revenue increased 25.5% over 2007 to $138.8 million.  Defendant Perik commented on the results, stating:

> The Princeton Review made significant progress in 2008.  Our financial results and key metrics underscore the operational and financial improvements we have made in turning around the business….  Importantly, we also assumed greater control over

brand management and promotion, and streamlined operations as we continue to transform and enhance the business.

40.    The press release also provided the Company's sales outlook stating:

For the full year 2009, the Company expects revenue growth to be between 16% and 20% including the full year results from the Company's remaining domestic franchises that were acquired in 2008.  The Company also expects earnings before interest, taxes, depreciation and amortization (EBITDA) to be between 10% and 13% of our revenues in 2009.

41.    That same day, the Company held an earnings conference call.  During the call, defendant Perik touted the Company's turn-around efforts and its future business prospects, stating:

**Michael Perik** – *Princeton Review – President & CEO*

Thanks, Steve.  Eighteen months ago our team was brought in to turn around the Princeton Review.  Our first task was to make the operation profitable.  Through a combination of cost cutting and a refocus on our core Test Prep business, I believe we've turned the corner in 2008.

The task in 2009 is now to grow the business profitably.  The guidance that Steve just gave will even at its low end, essentially double our EBITDA.  We have confidence in those goals when we look at the current trajectory of our Test Prep business and our SES business, and with the pending sale of K-12 we believe there are continued opportunities to reduce, reproduce costs.

I will reemphasize something that I said in my, earlier in my remarks.  I think we are very encouraged by the fact that we (inaudible) about 40% of our retail enrollments to date.  We are very encouraged by the trend right now, which has our enrollments up around 15% and our retail courses albeit at a lower price point which is planned in our business, but we are experiencing organic growth in our retail business right now.

42.    On March 16, 2009, Princeton Review filed with the U.S. Securities and Exchange Commission ("SEC") its Annual Report for 2008 on Form 10-K (the "2008 Form 10-K").  In the 2008 Form 10-K, defendants Perik, Richards, Lowenstein, Crisan, Evanson, Katzman, Krupka, Schnabel, and Whitlock discussed the Company's restructuring efforts, stating:

*Restructuring*

In 2007, we initiated a restructuring effort which resulted in restructuring expenses of $8.9 million and $2.2 million for the years ended December 31, 2007 and 2008, respectively.  The costs incurred related to the relocation of our finance and certain legal operations from New York City to offices located near Boston, Massachusetts, and the consolidation of the remaining New York offices.  The relocation was undertaken in order to improve the financial reporting process and to continue

remediation efforts related to material weaknesses we previously reported in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007.

We announced and commenced a restructuring initiative in the first quarter of 2009 related to our decision to outsource our information technology operations, transfer the majority of remaining corporate functions located in New York City to our offices located near Boston, Massachusetts, and simplify our management structure following the sale of the K-12 Services Division. The Company expects to incur approximately $3.0 million of charges related to these actions consisting of severance benefits for terminated employees and consulting fees related to transition of information technology operations to a third party. The Company expects to record the majority of these expenses and make related cash payments over the first and second quarters of 2009.

43.    On May 7, 2009, Princeton Review issued a press release announcing its financial results for the first quarter of 2009, the period ending March 31, 2009. For the quarter, the Company reported that revenues increased 25.5% to $44.8 million as compared to $35.7 million during the same period in 2008, and income from continuing operations before taxes was $2.2 million as compared to $0.3 million during the same period in 2008. Defendant Perik focused the public's attention on the Company's restructuring progress stating:

Our financial performance in the first quarter demonstrates the continuing progress we have made in moving toward our goal of returning The Princeton Review to sustainable profitability…. The positive impact of operational changes made in 2008 are being felt and we are pleased with our revenue and margin performance during this quarter and the reduction of corporate expenses compared to the first quarter of 2008, especially in light of overall economic conditions.

44.    Following the press release, the Company held an earnings conference call. During the call, defendant Perik again spoke positively about Company's restructuring progress and continued growth, stating:

**Michael Perik** – *Princeton Review – Chairman and CEO*

Thank you, Steve. The Princeton Review's management is pleased with the results of this quarter. In a challenging economic environment I think we've made substantial progress on the year-over-year basis. But quarters, of course, only tell you what happened in the past. I think we are equally pleased when we look forward. Our enrollment growth is strong, our successful National Testing Day initiative, which I discussed, and our strong institutional pipeline are giving us confidence that 2009 will be the most successful year that the Princeton Review has ever had.

And with that, Steve and I would be happy to take any questions.

* * *

- 14 -

**Jason Anderson** – *Stifel Nicolaus – Analyst*

Okay, great.  A thought, too -- in Test Prep, looking into the growth there, you guys, I think you talked about seeing some organic growth this year.  It doesn't appear there was any this quarter.  Is that somewhat of a seasonal thing, or do you still have that view here for '09? Do we expect to see some organic growth?

**Michael Perik** – *Princeton Review – Chairman and CEO*

*   *   *

So I think we are – as I said in my closing remarks, we're quite confident on the back end of the year.  We're at a point now in May where over half of the enrollments for the year have been already booked.  So our visibility starts to get better and better with every week, and I think we like where things are headed right now.

45.     On August 6, 2009, Princeton Review issued a press release announcing its financial results for the second quarter of 2009.  For the six month period ending on June 30, 2009, the Company reported that revenues increased 9.3% to $76.3 million as compared to $69.8 million during the same period in 2008.  Defendant Perik commented on the results, stating, they were a reflection of the Company's continued execution of its restructuring:

> Our revenue growth for the six months ended June 30, 2009, while positive, has been negatively affected by continuing macro-economic challenges and industry pricing pressures.  ***Despite this our earnings growth reflects the continued effective execution of our strategy.  Both our test prep and supplemental educational services businesses are subject to seasonality and a greater proportion of our first half revenues fell in our first quarter this year as opposed to our second quarter.***  This was especially true for our SES division….  Our test prep enrollments are up, which we believe is an indicator that consumer awareness of The Princeton Review and our overall brand presence in the marketplace continues to grow.

46.     On August 6, 2009, the Company held an earnings conference.  During the call, defendant Perik spoke positively about Company's progress and turn-around in the Company's enrollment trends, stating:

**Michael Perik** – *Princeton Review – Chairman and CEO*

*   *   *

Given where we are at this point in the year, I think I am in a position to be able to give investors a pretty good view of management's belief of where fiscal 2009 is going to end up.  We are now at a point in the year, we have good visibility on where things should be on December 31 and I want to share that perspective with you.

The Princeton Review's financial performance in 2009 has been driven by three major factors. The first is year-over-year pricing trends, the second is enrollment trends and the third is the shift between tutoring and retail courses with our customers.

Ever since the economy turned last summer, we have seen our clients migrate to lower-cost products in our system. Obviously as prices come down, that's put pressure on margins. We had said in previous calls that our goal had been to grow enrollments at a rate that would help offset that margin impact.

Q1 successfully did that, did it because, in that quarter, enrollment growth outpaced the price decline. Q2 was less successful in mitigating the impact. We had enrollment growth but at a lesser rate than the average prices fell by.

We expect that the back half of the year will be more successful in that, in this vein. Our confidence in saying that is right now with almost 80% of our annual retail enrollment book, we expect to see the last half of the year as essentially flat in dollars in our retail business, but high single digit enrollment growth.

\* \* \*

Now, investors need to remember that there is a lag between when we book a tutoring customer and when we ultimately recognize that revenue. And that lag can be measured in several months. ***I am able on this call, however, to report that we have seen that shift that started last summer and last fall away from tutoring, start to slow its decline in recent months and, frankly, come very close to flattening out if not turning around in the right direction. And that is a bullish sign for the balance of the year***.

***Speaking of the balance of the year, the Company is giving guidance today of annual revenue growth between 7 and 10% in a range of EBITDA profitability before restructuring between 10 and 13%. Such guidance essentially assumes behind it that our test prep business will be essentially flat organically in the back end of the year***.

Now as of today, when we look at our retail bookings in the third and fourth quarters, that is exactly what we are seeing right now. They are essentially flat. Our tutoring booking as I mentioned earlier has reversed course recently and then the last few weeks it actually started to trend upwards – particularly in the first part of August.

We think that this is frankly a sign of an improved economy and something that will benefit from. So, overall, if the business continues to trend as it is trending today, we will end up at a minimum doubling our EBITDA before our restructuring charges that we announced earlier in the year on a year-over-year basis.

47.     On September 24, 2009, Princeton Review filed a Registration Statement on Form S-3 (the "Registration Statement") with the SEC that authorized the Company, from time to time, to offer and sell up to $75 million of any combination of preferred stock, common stock, units, and

warrants.  Defendants Perik, Richards, Rao, Lowenstein, Crisan, Evanson, Krupka, and Whitlock all signed the Registration Statement.

48.     On November 5, 2009, Princeton Review issued a press release announcing its financial results for the third quarter of 2009, the period ending September 30, 2009.  For the quarter, the Company reported revenue of $34.3 million compared to $34.7 million in 2008 during the same period.  Defendant Perik commented on the results, stating as follows:

> Our financial results demonstrate achievement of sustainable profitability, even in the midst of a difficult economy.  Due to the positive impact of earlier cost reductions and the **stable performance of our core Test Prep business**, we are generating positive cash flow….  We are investing in our customer supporting technology, including expansion of our online offerings to extend our market reach, bring products to market more quickly, and meet evolving consumer demand.  In addition, the pending acquisition of Penn Foster gives us entry into the worker retraining market and strengthens our marketing and partnership capabilities.  We expect that these actions will deliver meaningful financial benefit over time.

49.     That same day, the Company held an earnings conference.  During the call, defendant Perik stated unequivocally that "the turnaround has worked."  In addition, defendant Perik touted his strategies for gaining market share from competitors, stating:

**Michael Perik** – *Princeton Review – Chairman, CEO*

> Thank you, Steve.  Well, I have a few headlines that I hope investors will take away from this call today.  ***First, it is that the turnaround has worked.***  The clearest evidence of this is the significant cash flow we have generated this year.  We've used it to pay down our debt, used it to invest in better systems and in new online products.

> ***Secondly, we are seeing real improvements in the test prep marketplace***.  Remember, the revenue we are reporting today reflects decisions that consumers made last spring.  And in the second quarter, which was a challenging one for us, the revenue we were reporting then were decisions that people had made back in the winter, when the economy was particularly bleak.

> Today, consumers are making decisions – buying our tutoring services and our retail businesses – which clearly show us that things have bottomed out.  And in fact, we have had a positive reversal of trend lines.  So the revenue that we book today with our customers will end up being reported to investors early next year or into the spring of next year.  So there's a long lead time between when you get visibility on it and when we get visibility on it.

*A part of this improvement, I think, is driven by economic conditions; but frankly, I think our new strategies are working, both from a product and a marketing perspective, and I think we are gaining market share over our competition*.

50.     On November 5, 2009, the Company held an earnings conference call.  On the conference call, defendant Perik responded to a question about the competitive market stating that he expected strong growth in enrollment and revenue:

> Sitting here right now, my enrollment growth outpaces my revenue growth but both of them are in the double-digit area right now for 2010.  So we feel that we're in a very good position, both from a pricing point of view and from our market momentum.

51.     On March 11, 2010, Princeton Review issued a press release announcing its financial results for the fourth quarter and full year 2009.  For the full year, the Company reported that revenue was $143.5 million, an increase of 3.4% from $138.8 million in 2008.  Princeton Review reported a loss from continuing operations before taxes of $13.1 million for the full year 2009 compared to income of $1.3 million in 2008.  Defendant Perik commented on the results, stating that they marked "the beginning of a new phase of The Princeton Review's transformation:"

> We are pleased that the end of 2009 marks the beginning of a new phase of The Princeton Review's transformation.  Over the past two and a half years, we have evolved from a test preparation and SES tutoring business to a diversified educational services company with test preparation, post secondary education and career education businesses…. Our financial results reflect this transformation and as of January 2010, we have two primary businesses of equal scale, both with strong brand recognition in their respective markets.

52.     The press release also provided a financial outlook for the Company and stated as follows:

> For the full year 2010, The Princeton Review expects revenue of approximately $225 million to $235 million, including the full year results from the Penn Foster acquisition and excluding any revenues associated with the anticipated joint venture with the National Labor College.  The Company also expects earnings before interest, taxes, depreciation, amortization, stock based compensation, restructuring and acquisition expenses (Adjusted EBITDA) to be between 12% and 14% of our revenues in 2010, after recording an estimated $8 to $10 million of expenses for start up and organizational costs associated with the National Labor College and community college joint ventures.

53.     On April 15, 2010, the Prospectus became effective and fourteen million shares of common stock of Princeton Review at $3 per share were sold to the public, thereby raising $42

million.  On or about April 20, 2010, Roth Capital Partners exercised the over-allotment option to purchase an additional 2.1 million shares.  In total, 16.10 million shares were sold by the Company in the Offering.

54.     The Registration Statement and Prospectus for the Offering incorporated various documents by reference, including the Company's 2008 Form 10-K filed with the SEC on March 16, 2009; the Company's Quarterly Reports on Form 10-Q for the period ended March 31, 2009, filed with the SEC on May 8, 2009, and for the period ended June 30, 2009, filed with the SEC on August 7, 2009; and the Company's Current Reports on Form 8-K filed with the SEC on March 18, 2009, March 31, 2009, and April 20, 2009, and amended Current Report on Form 8-K/A filed with the SEC on March 30, 2009.

55.     On May 6, 2010, Princeton Review issued a press release announcing its financial results for the first quarter of 2010, the period ending March 31, 2010.  For the quarter, Princeton Review announced a 41% increase in revenues to $63.2 million, up from $44.8 million in the same period in 2009.  Defendant Perik commented on the results, stating:

> Our financial performance in the first quarter demonstrates that we are continuing the transformation process for The Princeton Review.  That momentum carried through into April when we successfully issued 16.1 million shares of common stock, raising sufficient proceeds to pay off our bridge facility relating to the Penn Foster acquisition…. The positive impact of these changes in our capital structure provides us with further financial flexibility to execute on our strategies, and to continue improving the growth characteristics of our core test prep and online career educational services businesses.

56.     Following the Company's announcement of defendant Richards's resignation and his replacement by defendant Kasper, on August 5, 2010, Princeton Review issued a press release announcing its financial results for the second quarter of 2010, the period ending June 30, 2010.  For the quarter, Princeton Review announced that total revenue increased 79% to $56.2 million, up from $31.5 million reported in the same period in 2009.  Defendant Perik touted the Company's new business and the growth in the Company's core business, stating:

> Our test prep business has improved and Penn Foster continues to steadily grow, demonstrating the strength of our core businesses…. On the test prep side, our 55% growth in the institutional channel has begun to validate the opportunity for our company to reach a differentiated customer segment.  Increasing Federal money for college readiness programs underscores the opportunity within this market segment.

The integration of the Penn Foster business is tracking well, and we have achieved approximately $3 million in cost savings based upon actions taken to date. We expect the integration and restructuring to eventually achieve cost savings in the $4-$6 million range on a run-rate basis.

Our new business ventures in post secondary education with the AFL-CIO and Massachusetts community colleges continue to progress. This week, for instance, we are launching our first statewide marketing relationship with the Rhode Island Institute of Labor Studies and Research that will offer more than 25 of our certificate and associate degree programs starting this fall. At Bristol Community College in southern Massachusetts, our allied health care programs have begun their first enrollments for three degree programs commencing in October. It's exciting to see these initiatives begin to take in enrollments, bringing affordable and accessible education to America's working families.

57.     On November 5, 2010, Princeton Review issued a press release announcing its financial results for the third quarter of 2010, the period ending September 30, 2010. For the quarter, Princeton Review announced that total revenue increased 59% to $54.4 million, up from $34.3 million in the same period in 2009 and that the increase was attributable to $23.4 million in revenues generated by the company's Penn Foster division acquired in December 2009. Defendant Perik commented on the results, stating:

Our results in the third quarter reflected a more cost-conscious retail test prep customer, but it was also a period of pursuing new and greater opportunities in other market segments, including online, institutional, and our Community College Partnerships…. We believe these efforts will result in greater, more predictable and profitable revenues as these plans come to fruition.

**REASONS THE STATEMENTS WERE IMPROPER**

58.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     the Company's revenues and earnings were negatively impacted by operational problems and increased competition;

(b)     the Company shifted its focus and resources away from its core Higher Education Readiness Division to unproven projects to the detriment of the business;

(c)     contrary to the Company's public statements, the Company was not executing well on its turn-around plan;

(d)      the Company encountered significant problems in the Higher Education Readiness Division due to a product mix shift and increased competition;

(e)      defendants' positive statements about the Company were materially false and misleading; and

(f)      as a result of the foregoing, the representations concerning the Company's operations, performance, management, projections, and forecasts were improper.

### THE TRUTH EMERGES

59.      The truth behind the Company's business prospects and Individual Defendants' wrongful course of conduct began to emerge on March 8, 2011, when defendant Perik informed the Company of his resignation as a director and officer of the Company, effective immediately.  That same day, the Company's Board appointed John M. Connolly ("Connolly") as Interim President and CEO, effective immediately.  The Company then commenced an executive search for a permanent replacement.

60.      The next day, on March 9, 2011, the Company announced defendant Perik's resignation and the appointment of Connolly as Interim President and CEO.  That same day, Princeton Review issued a press release announcing its financial results for the fourth quarter and full year 2010.  For the full year 2010, loss from continuing operations was $50.4 million, compared to a loss of $13.9 million in 2009.

61.      On March 10, 2011, Princeton Review held an earnings conference call with investors and analysts to discuss the earnings announcement for the period ended December 31, 2010 and the Company's operations and prospects.  Defendant Kasper and Connolly led the conference call.  Connolly made the following statements, among others:

**John Connolly** – *The Princeton Review, Inc. – Interim President and CEO*

*  *  *

There is a clear path forward that we will communicate to our shareholders, and we're very excited about our prospects.  During my time as Interim CEO, my focus will be on the following four areas – one, addressing a number of strategic and operational issues across the Company; two, prioritizing our efforts in addressing the market opportunities in our core Higher Ed Readiness and Penn Foster businesses; three, clearly communicating to our shareholders our direction and our priorities and

where we see growth originating and how investors can measure this growth moving forward; and lastly, leading the search for a permanent President and CEO in the months ahead.

\* \* \*

Beginning with the higher education readiness business, a product mix shift in this segment, along with the dynamic competitive marketplace, made for a very challenging year in 2010. Despite this year of transition, we continue with our repositioning of this business.

\* \* \*

However, our path forward is clear. We will return to our roots as a differentiated branded player at a premium price point, leveraging our strengths in quality teaching, tangible results and experience. And let me note, we will be much more aggressive in how we sell our value proposition into this marketplace.

\* \* \*

And lastly, (technical difficulty) if we look at the world, the world has been moving very much to online activities across so many different areas. And one of the things that we are going to be doing a lot around here is how do we build out that capability, how do we leverage new solutions, how do we attack the institutional marketplace, how do we go into new markets domestically, and the list goes on.

62.     On the conference call, defendant Kasper discussed the decrease in the Company's

revenues:

**Chris Kasper** – *The Princeton Review, Inc. – EVP and CFO*

\* \* \*

Despite over a 4% increase in total course enrollments, revenues were down as customers opted for lower-priced product offerings. We expect this trend to diminish in 2011 as we anniversary the introduction of our lower-priced SAT course offering first introduced in November 2009 and as we reduce our emphasis on discounting practices.

63.     On this news, Princeton Review's market capitalization plunged more than 37% on

March 10, 2011, erasing almost $17 million in market capitalization in a single day. Further, the

very next day, the Company's market capitalization dropped an additional 24%, resulting in a loss of

over $6 million. In total, the announcement of defendant Perik's resignation in conjunction with the

earnings conference call resulted in a two-day capitalization loss of over $23 million.

64.     On April 1, 2011, the Company announced that on March 29, 2011, Princeton

Review received a deficiency letter from the NASDAQ Stock Market ("NASDAQ") stating that:

[B]ased on the closing bid price of the Company's listed securities for the last 30 consecutive business days, the Company no longer meets the minimum $1.00 per share requirement for continued listing on NASDAQ under Marketplace Rule 5450(a)(1).  Under Marketplace Rule 5810(c)(3)(A), the Company has a grace period of 180 calendar days, or until September 26, 2011, in which to regain compliance with the minimum bid price rule.

65.     On May 5, 2011, Princeton Review issued a press release announcing its financial results for the first quarter of 2011, the period ending March 31, 2011, which again reported a decrease in revenues of nearly $14 million, compared to the same period in 2010.  That same day, Princeton Review held an earnings conference call with investors and analysts to discuss the earnings announcement for the period ended March 31, 2011, and the Company's operations and prospects.  Defendant Kasper and Connolly led the conference call.  Connolly made the following statements, among others:

**John Connolly** – *The Princeton Review – Interim CEO*

\*   \*   \*

In our Higher Education Readiness business, the first-quarter results continue to reflect the cost-conscious customer trading down to our lower-price retail offerings in addition to a dynamic competitive landscape. Despite these challenges, we continued the repositioning of our business to return to our roots as a differentiated player at a premium price point, leveraging our strengths in quality teaching with tangible results.

In the Penn Foster business, we remain focused on attracting a more dedicated student, which we expect will increase graduation rates and ultimately improve profitability. We've been experiencing higher revenues per enrollment as a result of this strategy to-date.

As we progress through 2011, we will continue to prioritize our efforts around addressing the market opportunities for our Higher Education Readiness and Penn Foster businesses. Our commitment to this operating strategy was demonstrated by our recent announcement but that the Company has entered into a definitive agreement to divest its Community College Partnerships business. This action will limit future cash burn on an initiative that distracted us, both operationally and financially, from our core business. We look forward to further transforming our current strategic ventures into cash generating operations as we leverage valuable brands that represent the standards of our industry.

66.     On the conference call, defendant Kasper discussed the decrease in the Company's revenues:

**Chris Kasper** – *The Princeton Review – EVP. CFO*

- 23 -

* * *

Total revenue in the first quarter of 2011 was $49.7 million compared to $63.2 million in the prior-year period. The decrease was primarily attributable to our June 2010 exit from the SES business. Excluding SES revenue or $10 million in the first quarter 2010, the year-over-year decline was 7%. The non-SES decline was primarily due to a decrease in Higher Education Readiness revenue.

Loss from continuing operations was $12.3 million in the first quarter compared to a loss of $15.6 million in the prior-year period. The smaller loss included the reduction of depreciation and amortization expenses of $5.6 million, due in part to actions taken to close our New York City administrative office, as well as the decision to discontinue the use of our legacy ERP system. We also reduced cost of goods sold by $5.3 million, due in large part to the exited SES business.

* * *

Finally, as mentioned earlier, there was no revenue in the first quarter versus $10 million -- no SES revenue in the first quarter versus $10 million in the prior-year quarter as a result of our decision to exit this business last June.

67.     On August 5, 2011, Princeton Review issued a press release announcing its financial results for the second quarter of 2011, the period ending June 30, 2011. For the quarter, Princeton Review announced an additional 12% loss in revenue to $49.6 million, down from $56.2 million in the same period in 2010. That same day, Princeton Review held an earnings conference call with investors and analysts to discuss the earnings announcement for the period ended June 30, 2011, and the Company's operations and prospects. Defendant Kasper and Connolly led the conference call. Connolly made the following statements, among others:

**John Connolly** - *The Princeton Review –CFO*

* * *

Our Higher Ed Readiness segment realized year-over-year revenue growth for the first time in three quarters, and as a result of our focus on our core business and execution on our go-to-market strategy as a differentiated player at a premium price point, these efforts also contributed to ending the quarter with positive operating cash flow.

* * *

As we move into the back half of 2011, we will continue to eliminate distractions and apply our efforts towards driving value and growth in the Higher Ed Readiness and Penn Foster businesses.

For Penn Foster, this will include introducing new courses and pursuing new customer acquisition channels to drive growth with continued emphasis on engaging

students that are more committed to their future through [push] -- pursuing the opportunities our programs provide.

As we execute our growth strategy, we will remain focused on free cash flow generation and overall value creation for each of our core businesses at The Princeton Review.

68.    On the conference call, defendant Kasper discussed the decrease in the Company's revenues:

**Chris Kasper** – The Princeton Review – EVP. CFO

\* \* \*

Penn Foster revenue in the second quarter decreased 9% to 22.7 million as compared to the prior-year period.

While we achieved higher revenue per enrollment during the quarter, this was offset by a 17% decrease in the number of new enrollments. The decrease in enrollments was primarily driven by a reduction in third-party lead generation during the quarter, as well as the Company's strategy to target more committed students. The engagements of more committed students is expected to translate into better retention and ultimately higher profitability.

We are actively pursuing initiatives to increase lead generation, identifying more productive acquisition channels and improve our product management function.

69.    To date, Princeton Review's market capitalization is at an all-time low due to myriad of disclosures following defendant Perik's resignation.   Specifically, the Company's market capitalization has plummeted from nearly $44 million as of March 9, 2011, to approximately $7.6 million as of October 11, 2011.

## DAMAGES TO PRINCETON REVIEW

70.    As a result of the Individual Defendants' improprieties, Princeton Review disseminated improper, public statements concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.  These improper statements have devastated Princeton Review's credibility as reflected by an 83% market capitalization loss totaling nearly $36 million.

71.    Further, as a direct and proximate result of the Individual Defendants' actions, Princeton Review has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs for correcting the incorrect financial statements filed with government entities; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Princeton Review.

72.     Moreover, these actions have irreparably damaged Princeton Review's corporate image and goodwill.  For at least the foreseeable future, Princeton Review will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Princeton Review's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right and for the benefit of Princeton Review to redress injuries suffered, and to be suffered, by Princeton Review as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Princeton Review is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

74.     Plaintiff will adequately and fairly represent the interests of Princeton Review in enforcing and prosecuting its rights.

75.     Plaintiff was a shareholder of Princeton Review at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Princeton Review shareholder.

76.     The current Board of Princeton Review consists of the following seven  individuals: defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock Face a Substantial Likelihood of Liability for Their Misconduct**

77.     As alleged above, defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's operations, performance, management, projections, and forecasts.

78.     Defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock, as members of the Board, were responsible for ensuring that an adequate and effective system of internal controls was established and maintained.  The issuance of improper statements indicates a failure of oversight and inadequate internal controls.  Accordingly, defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock breached their fiduciary duty of loyalty by failing to establish and maintain a system of internal controls which was sufficient to prevent the issuance of these improper statements.  Thus, each member of the Board faces a substantial likelihood of liability for their breach of fiduciary duties, so any demand on them is futile.

79.     Defendants Lowenstein, Evanson, and Whitlock, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith because they failed to establish and maintain a system of internal controls which was sufficient to prevent the issuance of these improper statements.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

80.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Princeton Review's officers and directors and these acts are incapable of ratification.

81.     Each of the defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

82.     Princeton Review has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Princeton Review any part of the damages Princeton Review suffered and will suffer thereby.

83.     If Princeton Review's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Princeton Review.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Princeton Review against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Princeton Review to sue themselves or certain of the officers of Princeton Review, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors and officers' liability insurance, then the current directors will not cause Princeton Review to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

84.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Princeton Review for any of the wrongdoing alleged by plaintiff herein.

85.     Plaintiff has not made any demand on the other shareholders of Princeton Review to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Princeton Review is a publicly held company with over 54.7 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     The Individual Defendants owed and owe Princeton Review fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Princeton Review the highest obligation of good faith, fair dealing, loyalty, and due care.

88.     The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Princeton Review, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

89.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the statements regarding the Company's operations, performance, management, projections, and forecasts were improper. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

90.     Director Defendants Lowenstein Crisan, Katzman, Krupka, Schnabel, Warnock, Whitlock, Perik, and Evanson as directors of the Company, owed Princeton Review the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the

dissemination of the alleged improper statements concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) the Company's operation efficiency.

91.   The Individual Defendants knew or were reckless in not knowing that: (i) the Company's revenues and earnings were negatively impacted by operational problems and increased competition; (ii) the Company shifted its focus and resources away from its core Higher Education Readiness Division to unproven projects to the detriment of the business; (iii) contrary to the Company's public statements, the Company was not executing well on its turn-around plan; (iv) the Company encountered significant problems in the Higher Education Readiness Division due to a product mix shift and increased competition; and (v) defendants' positive statements about the Company were materially false and misleading.   The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements concerning: (i) the Company's turn-around efforts; (ii) the effect of competition on revenues and earnings; and (iii) its operation efficiency.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.   Accordingly, the Individual Defendants breached their duty of loyalty to the Company.

92.   The Audit Committee Defendants, Lowenstein, Whitlock, and Evanson breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Lowenstein, Whitlock, and Evanson failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

93.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Princeton Review has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

94.   Plaintiff, on behalf of Princeton Review, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     As a result of allowing improper statements to be made regarding Princeton Review's operations, performance, management, projections, and forecasts, the Individual Defendants have caused the Company to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

97.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

98.     Plaintiff, on behalf of Princeton Review, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Princeton Review.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Princeton Review.

101.     Plaintiff, as a shareholder and representative of Princeton Review, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

102.     Plaintiff, on behalf of Princeton Review, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Princeton Review, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Princeton Review to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Princeton Review and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.      a provision to permit the shareholders of Princeton Review to nominate at least three candidates for election to the Board; and

4.      a proposal to strengthen Princeton Review's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Princeton Review has an effective remedy;

D.      Awarding to Princeton Review restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: November 14, 2011

PARTRIDGE, ANKNER &
   HORSTMANN, LLP

s/Terence K. Anker
TERENCE K. ANKNER (BBO #552469)
PETER C. HORSTMANN (BBO #556377)
The Berkeley Building
200 Berkeley Street, 16th Floor
Boston, MA 02116
Telephone: (617) 859-9999
Facsimile:  (617) 859-9998

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
JULIA M. WILLIAMS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

RYAN & MANISKAS, LLP
RICHARD A. MANISKAS
995 Old Eagle School Rd., Suite 311
Wayne, PA 19087
Telephone: (484) 588-5516
Facsimile: (484) 450-2582

Attorneys for Plaintiff

660651

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system on November 14, 2011.

/s/ Terence K. Ankner
_____
Terence K. Ankner, Esq.